In re CENTRAL FLORIDA METAL
FABRICATION, INC., Debtor.

Bankruptcy No. 93–00270.

United States Bankruptcy Court,
N.D. Florida,
Gainesville Division.

April 7, 1997.

Lisa Cohen, Gainesville, FL, for Debtor in Possession.

### ORDER AWARDING ATTORNEY'S FEES

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came on for hearing on the application of the law firm of Ruff &

Cohen, P.A. for an award of attorneys' fees as attorneys for the debtor-in-possession in this case prior to its conversion from Chapter 11 to Chapter 7. By its application, Ruff & Cohen seeks an award of $39,420.00 in attorneys' fees plus $1,034.00 in costs for a total award of $40,454.00, with $5,000.00 credited to that amount from the pre-petition retainer received by the firm. In a supplement to its application filed shortly before the hearing, Ruff & Cohen requested that the fees be enhanced by increasing the hourly rate of Lisa Cohen, lead attorney for the debtors, by $25.00 per hour, thus increasing the requested fees to $41,421.00. This request for enhancement was, wisely, abandoned during the hearing. The United States Trustee objected to the fee application on several grounds. Included in the grounds asserted by the U.S. Trustee were that the debtors failed to disclose the arrangements entered into after the petition for relief was filed, a lack of disinterest during the administration of the case, a breach of fiduciary duty by allowing the debtor to incur post-petition unpaid debt with the IRS, lack of benefit to the estate by the attorneys' services, and an improper allocation of time between this case and the companion case involving the debtor's principles. Having considered the testimony of witnesses, arguments of counsel, and the entire administrative file in this case, I make the following findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

### Facts

This case was commenced by the filing of a petition for relief under Chapter 11 of the Bankruptcy Code[1] on September 16, 1993. Upon the filing of the case, the Court authorized the employment of the law firm of Ruff & Cohen, P.A. to represent the debtor-in-possession. Lisa Cohen, an experienced bankruptcy attorney, was lead counsel and has performed almost all of the services contained in the application for fees. Contemporaneously with the filing of the instant petition, James and Linda Wicker, the sole stockholders and officers of the debtor corporation, filed a joint petition for relief under Chapter 11 and were also represented by Lisa Cohen.

The debtor in this case was a sheet metal fabrication company which had been operating since 1975. During the early 1990's, business dropped off, and the company had to borrow from First Union Bank in order to keep operating. In 1993, the company fell behind on its payments to First Union and the bank began proceedings to foreclose its mortgage on the building which housed the debtor's operation and to enforce its lien on all of the debtor's equipment and accounts receivable. This petition was filed as a result of the collection actions being taken by First Union Bank. In addition to the First Union Bank debt, which totaled approximately $229,000[2] when the petition was filed, the debtor owed approximately $41,000 to the Internal Revenue Service (IRS) for unpaid payroll taxes, $11,200 to the State of Florida Department of Revenue for unpaid sales taxes, and $12,600 to the State of Florida Department of Labor and Employment Security for unemployment taxes.

After the petition was filed, as expected, the debtor and First Union litigated over adequate protection and use of cash collateral. Several hearings were conducted which resulted in various cash collateral orders being entered by the Court. The burden of the First Union debt clearly presented the greatest and most immediate obstacle to the debtor's ability to reorganize. Extensive negotiations were conducted between debtor's counsel and counsel for First Union which ultimately resulted in a settlement of the entire First Union debt. Under the settlement, which was finally reached on or about August 25, 1994, First Union agreed to accept $150,000 cash plus a promissory note in the amount of $17,000, secured by a pledge of the assets of the corporation. In addition,

---

**1.** 11 U.S.C. § 101 et seq. (1996). For administrative convenience, all references to the Code will be by section and number.

**2.** $127,000 was personal debt of the Wickers individually, secured by the mortgage on the building owned by them, in which the debtor operated. The corporate assets were pledged to secure a note with a balance of $102,000, which was also guaranteed by the Wickers individually, and secured by a third mortgage on the building.

Dawn Capella, the holder of a second mortgage on the building in the amount of $47,-000 agreed to release her mortgage on the building. In order to effectuate the settlement, a sale and leaseback agreement was arranged with one of the debtor's employees, Raymond Dyal. Because of the demands by First Union, closing of the sale had to be done in a short period of time.

An additional complication which arose during the negotiations for the settlement and the sale was the fact that the debtors had allowed post-petition payroll taxes to the IRS to go unpaid, and by September of 1994, the post-petition claim of the IRS was approximately $33,000. Mr. Dyal, the prospective purchaser of the building, was justifiably concerned that this large administrative claim, which would have to be paid cash on confirmation under any Chapter 11 plan, would preclude the debtor from being able to confirm a Chapter 11 plan. If that were to happen, he would be stuck with a building and no tenant. To salvage the deal, debtor's counsel was able to negotiate an agreement with the IRS under which it would agree to accept payment of its administrative claim in deferred payments under the Chapter 11 plan as long as the debtor did not fall any further behind in its payroll taxes during the administration of the Chapter 11 case.

Due to the efforts of counsel for the debtor, everything fell into place and the transaction closed on September 27, 1994. The result of the closing was that First Union's debt was completely satisfied, with the exception of a $17,000 promissory note, which it assigned to a third party who subsequently forgave the debt. The equipment and accounts of the debtor were released from the liens, and the corporation was able to continue to occupy its business premises and pay rent to Mr. Dyal for use of the premises. Also included was the agreement by the IRS that it would not insist on payment of its administrative claim in full on confirmation as long as the debtor did not fall further behind in its payments.

As part of the agreement with the IRS, the debtor was required to provide the IRS with a copy of its payroll tax deposits within three (3) days of making each weekly deposit, and to fax proofs of the deposits to both the Special Procedures branch in Jacksonville and to the United States Attorney in Tallahassee. While this procedure appeared to be sufficient to ensure that the debtor would not fall further behind in its payroll taxes, there was a glaring shortcoming in the procedure which, in my view, greatly contributed to the ultimate demise of this debtor. While the debtor was required to submit proof of the deposits to the IRS and its counsel, debtor's counsel did not require that such proof be sent to her. Instead, she relied entirely on the government to monitor the situation.

After settlement with First Union, sale of the building, and agreement with the IRS, it looked like smooth sailing for the debtor. It operated in the succeeding months and filed a first amended plan of reorganization on March 6, 1995. While things looked promising on the surface, there were several problems brewing which initially disrupted a move towards confirmation and ultimately doomed the debtor. The first problem arose in late February of 1995 when Tappouni Mechanical, Inc., a general contractor with which the debtor had a subcontract, filed an application for allowance of an administrative expense in the amount of $283,633.79. This claim was based on a pre-petition executory contract which the debtor continued to perform after the petition but without ever formally assuming. In February of 1994, the contract was terminated by Tappouni based on various breaches by the debtor. Prior to Tappouni's administrative expense application, the debtor had believed that it was owed money by Tappouni rather than owing a large sum based on breach of contract damages. The debtor opposed the application and after considerable negotiation was able to convince to Tappouni to reduce the claim to just over $122,000. However, Tappouni pursued its claim for administrative expense status for this amount.

After a lengthy hearing on Tappouni's application, and extensive briefing by both sides, I ruled that Tappouni's claim was not entitled to administrative expense status but was merely a general unsecured claim. This was based on a finding that even though the debtor had affirmatively indicated to Tap-

pouni that its contract would not be affected by the bankruptcy filing, the debtor never formally assumed the contract pursuant to the provisions of Section 365, and therefore there could be no administrative claim. While this litigation saved the debtor from having an additional large administrative claim, it nevertheless resulted in a new and very large unsecured claim which would have to be dealt with under any plan of reorganization.

The next problem which arose involved the new lease on the building with Mr. Dyal. In June of 1995, Dyal filed motions to dismiss or convert the case and for relief from the automatic stay to evict the debtor from the premises. This was based on allegations of missed payments under the lease agreement. Also, the motion to dismiss or convert brought to light for the first time a $15,000 loan from Dyal to the debtor without court authority or even disclosure. This litigation was settled on August 3, 1995, with a stipulation for adequate protection which enabled the debtor to continue to operate out of the premises.

Meanwhile, with a view towards accumulating cash for payment of administrative expenses at confirmation, more particularly attorneys' fees, on June 7, 1995, Ruff & Cohen had the debtor sign an agreement whereby the debtor was required to deposit a total of $20,000 into the Ruff & Cohen trust account within 105 days, failing which Ruff & Cohen was authorized to file a motion to convert the case to a Chapter 7 or to file a liquidating Chapter 11 plan. In exchange for the agreement, Ruff & Cohen agreed not to move to withdraw from the case. Subsequently, on October 25, 1995, an additional agreement was signed requiring the total sum of $24,802.15, the amount of accrued attorneys' fees at that time, to be deposited in the trust account no later than October 31, 1995. Pursuant to those agreements, the debtor deposited a total of $18,845 into the Ruff & Cohen trust account between July 10, 1995, and December 22, 1995. This total, together with $200 which had previously been deposited into the trust account in February of 1995, brought the total amount in trust to $19,045. The debtor did not seek court authority to make these deposits, the attorneys did not file a disclosure of the arrangement pursuant to Fed.R.Bankr.P. 2016(b), nor was the money deposited into the trust account reflected on the debtor's monthly operating reports as an asset of the debtor's estate.

On November 6, 1995, the U.S. Trustee filed a motion to dismiss or convert based on the facts that the debtor had been in Chapter 11 for over two years without having confirmed a plan of reorganization, and that the debtor was five quarters delinquent in paying its statutorily required fees to the U.S. Trustee. A hearing was held on the U.S. Trustee's motion on January 4, 1996. At this hearing, it became clear that the debtor's prospects for reorganization were slim. In addition to being seriously delinquent in paying U.S. Trustee's fees, the debtor was two months delinquent in filing its monthly operating reports. During that hearing, Linda Wicker, who was the debtor's office manager and one of the principles, testified but was unable to give any current financial information on the debtor's operations. She had no idea what the debtor's income was for the months of October, November or December, the three months previous to the hearing. From my observation of Mrs. Wicker at that hearing, it was clear that she was incapable of managing the financial affairs of the debtor. In reviewing the file for the period prior to the January 4, 1996 hearing, it appeared that the monthly operating reports were never filed on a timely basis and generally were filed in batches covering several months with some reports being as much as four (4) months overdue. At the end of that hearing, I was strongly inclined to grant the U.S. Trustee's motion and convert the case and to announce my intention to do so in court. However, I was convinced by the persistent pleading by Mrs. Cohen on behalf of the debtor and the Wickers to give them just one more chance to put the debtor on a very strict schedule for going forward and demonstrating an ability to reorganize.

Approximately three weeks following the January 4th hearing came the straw that broke the camel's back. At that time, Mrs. Cohen was advised by the IRS that the post-

petition tax claim which she thought was approximately $34,000, based on a letter she had received on May 18, 1995, from the district counsel, had in fact grown to $57,374. Cohen blames the IRS for failure to notify her that the debtor had fallen further behind in its payroll taxes and for actually misleading her in its May 18, 1995 letter reflecting the post-petition tax accrual to be $34,489. It thus became clear that the IRS would no longer agree to payment of its post-petition taxes over time, and at Cohen's insistence, the debtor and the Wickers embarked on a course of liquidation of both individual and corporate assets to attempt to raise sufficient cash to pay the administrative expenses at confirmation. The Wickers' plan was to sell their homestead and to liquidate two unused pieces of equipment owned by the debtor. To insure that the equity in the Wickers' homestead would be dedicated to the debtor's plan, Mrs. Cohen and the Wickers signed an agreement providing that the proceeds from the sale of the homestead would be deposited in Ruff & Cohen's trust account with any amounts in excess of Ruff & Cohen's attorneys' fees claim to be delivered to the debtor for payment to the IRS. Mrs. Cohen also prepared a note and mortgage for the Wickers' execution to secure this agreement. As with the two previous agreements regarding payment of funds into Ruff & Cohen's escrow account, this agreement was not approved by the court nor was the Rule 2016(b) disclosure made in relation thereto. Due to subsequent events, however, the sale of the Wickers' homestead did not go forward and therefore the mortgage did not come into play.

The debtor, having filed its second amended plan of reorganization on January 24, 1996, as required by the court following the January 4th hearing, filed its third amended plan of reorganization and fourth amended disclosure statement on May 6, 1996. The IRS, however, on April 15, 1996, filed its motion to dismiss based on the continued accrual of post-petition tax liabilities. Also, the debtor filed a notice of intent to sell property of the estate pursuant to Section 363(b) with a twenty (20) day objection period. The U.S. Trustee objected to the notice of intent to sell based on insufficient informa-tion contained in the notice. A hearing was scheduled for May 16, 1996, for consideration of the fourth amended disclosure statement, the IRS' motion to dismiss, a continuation of the U.S. Trustee's previously filed motion to convert or dismiss, and the objections to the debtor's notice of intent to sell property of the estate.

At the May 16, 1996 hearing, it became crystal clear that I should have followed my inclination at the January 4th hearing and I converted the case at that time. The disclosure statement and plan under consideration on May 16th consisted of little more than smoke and mirrors craftily designed by debtor's counsel. The financial information supplementing the disclosure statement totally failed to demonstrate any possibility of the debtor achieving operating results sufficient to fund the proposed plan. In the disclosure statement itself, the debtor, through counsel, had the gall to present comparative balance sheets for the date the petition was filed and the date of the disclosure statement and comment that "as shown in Exhibit 9, the debtor has increased its net worth by approximately $10,389.98 during the pendency of the case. This figure represents profit." This incredible statement was based on a net worth analysis showing a negative net worth of $190,690.23 on the petition date and a negative net worth of $183,119.41 as of May 3, 1996. However, of the total liabilities of $424,779.99 reflected as of May 3, 1996, $123,664.52 represented post-petition administrative debt, mostly unpaid taxes. The primary change in the liabilities ledger resulted from the settlement with First Union Bank, and not from any payments to creditors. Also, after having carried and reported $236,565 in accounts receivable on the petition date and throughout the case, in doing its comparative balance sheets the debtor retroactively wrote off as uncollectible some $190,000 in accounts, thus showing accounts receivable as of the petition date of $45,-523.37. Thus, the alleged profitability of the debtor during two and a half years of operation under Chapter 11 was in fact the result of a settlement resulting in a satisfaction in excess of $100,000 of secured debt and the retroactive writeoff of $190,000 in accounts

receivable. The statement that the manufactured decrease in negative net worth represents profit was nothing but a blatant attempt to mislead creditors in hopes of achieving confirmation of the plan.

Even if the plan was economically viable, the terms of the plan as proposed was so heavily tilted in favor of the Wickers' individually that it is highly unlikely that it would have ever been accepted by the unsecured creditors. Under the terms of the plan, unsecured creditors, with claims totaling $188,000, would receive a minimum of $60,000 payable over sixty (60) months, without interest, to begin in the thirteenth month after the effective date of the plan. Using a discount rate of eight percent, the value as of the effective date of the plan of those payments would be only $37,476. The plan further provides that during the sixty month payment period, the debtor would distribute one third of any "excess profits" to unsecured creditors up to a maximum amount of 100% on all claims, with no interest. The debtor defined excess profits as "any remaining income after deduction of operating expenses; salaries to Jim Wicker of $55,000 and to Linda Wicker of $30,000; depreciation expense for any post-confirmation acquired property; payments provided for by this plan; and all taxes generated on the income under review." Prior to the filing of this Chapter 11, the maximum salary Jim Wicker had ever received was $36,000 and the maximum Linda Wicker received was $25,200. Thus, under the terms of the plan, even if the debtor were able to generate sufficient profits over a six year period, the maximum unsecured creditors could receive would be payment of 100% of their claims with no interest while the Wickers would receive $510,000 in salary plus another $256,000 in value to the corporation. Clearly, this plan was for the benefit of the Wickers and not the creditors of this estate.

Having concluded that confirmation of a plan was not possible, I ordered conversion of the case at the conclusion of the May 16, 1996 hearing. The chapter 7 trustee has liquidated all of the hard assets of the corporation and collected those receivables it could. A summary of assets in the estate as of the date of hearing on the attorney's fee application reflects total assets of $173,460, with Chapter 7 administrative claims and expenses totalling $49,981. The Alachua County Tax Collector has a pre-petition claim secured by assets of the estate in the amount of $20,400 leaving just over $103,000 for payment of the Chapter 11 administrative claims. Those claims (including the instant fee application) total in excess of $122,000. Thus, if the instant application is approved in its entirety, the post-petition tax claimants will not be paid in full.

### Analysis

The starting point in crafting an appropriate attorney fees award is to multiply a reasonable hourly rate by the number of hours worked, thus arriving at the "lodestar." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir.1994). After determining the lodestar, a court must determine if an adjustment is necessary due to the results obtained. *Norman v. Housing Authority*, 836 F.2d 1292, 1302 (11th Cir.1988). The court should award the full lodestar amount only if the results obtained are excellent. *Id.* If the result was only partial or limited success, then a reduction in the lodestar is appropriate. *Id.* In reducing the lodestar, "the court may attempt to identify specific hours spent in unsuccessful claims or it may simply reduce the award by some proportion." *Id.* The result of this lodestar analysis is an amount of attorney fees which is reasonable.

■ To be awarded in a bankruptcy context, attorney fees must not only be reasonable, they must also meet the criteria set forth in Section 330(a). "Section 330 of the Code gives the bankruptcy court discretion to award a reasonable attorney fee for 'actual, necessary services.' 11 U.S.C. § 330(a)(1). An element of whether the services were 'necessary' is whether they benefitted the estate." *In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323 (10th Cir. 1993). Other factors the court may consider when determining whether a fee is reasonable are "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title ..." 11 U.S.C. § 330(a)(1).

■ There are two other relevant areas where a court may exercise its discretion to reduce or deny attorneys their fees. First, counsel for the debtor-in-possession has an affirmative duty to disclose all of its fee arrangements with debtor-in-possession. 11 U.S.C. § 329(a); Fed.R.Bankr.P. 2016. "Anything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." *In re Saturley*, 131 B.R. 509, 517 (Bankr.D.Me.1991). Although a denial of fees is not required, a "court may exercise its discretion to deny or reduce fees for counsel's failure to disclose its fee arrangements whether or not actual harm accrues to the estate." *Id.* Next, Section 327(a) provides that a professional may be employed by a debtor or debtor-in-possession only if the professional does not hold or represent an interest adverse to the estate, and the professional is a disinterested person as defined by Section 101(14). If, at any time during the representation, a professional ceases to be disinterested or holds an interest adverse to the estate, then "the language of 11 U.S.C. § 328(c) *permits* a court to deny compensation to professionals found not to be disinterested persons, but does not *require* a denial of fees in those instances." *In re Prince*, 40 F.3d 356, 359 (11th Cir.1994) (emphasis in original).

■ The United States Trustee, in its objection to the instant fee application, seeks initially for all fees to be denied. In support of this objection, the U.S. Trustee alleges that Ruff & Cohen's failure to disclose the agreements under which the debtor paid money into the law firm's trust account and the mortgage payable to the trust account from the proceeds from the proposed sale of the Wickers' homestead constitutes violations of Fed.R.Civ.P. 2016(b), and accordingly constitute grounds for denial of all fees. The U.S. Trustee also asserts that these arrangements created an adverse interest to the estate for the attorneys and that they were therefore no longer "disinterested". Although there may have been a technical violation of Rule 2016(b) by Ruff & Cohen, as previously pointed out, the Court has discretion as to whether or not to deny fees based on such violation. In this case, neither the estate nor its creditors have suffered any harm as a result of the agreements. All of the sums deposited in the trust account were turned over to the Chapter 7 trustee upon conversion and are thus available for distribution to creditors. The mortgage given to insure the payment of equity from the Wickers homestead never became operative since the home was not sold. Although the main function of the agreements was to attempt to insure the availability of funds to pay attorneys' fees upon confirmation of a plan, the application of those funds was always subject to approval of this Court. Whether attorney's fees or taxes were to be paid on confirmation of a plan, the debtor would have needed to have the funds available to do either. Therefore, I do not find that the agreements regarding payments *into* the Ruff & Cohen trust account and the agreement to give a mortgage on equity from the Wickers' home are cause to deny all fees based either on violation of Rule 2016(b) or based on an adverse interest by the attorneys.

■ The U.S. Trustee also asserts that since the commercial building which was subject to the First Union litigation and the real estate closing was owned by the Wickers individually, the attorneys should have allocated a portion of the fees to the Wickers' individual case. While the building did in fact belong to the Wickers individually, their estate derived virtually no benefit from the litigation and transaction regarding the building. They sold an asset with considerable value, possibly value in excess of the liens against it, in order for the corporation to continue to occupy its place of business. The Wickers individually did not receive any of the proceeds from the sale of the building. Therefore, I find that the debtor corporation was the beneficiary of the attorneys' efforts with regard to the First Union litigation and the sale of the building, and the allocation of fees by the attorneys is proper.

The U.S. Trustee asserts that the attorneys have breached their fiduciary duty to the creditors of the estate by allowing the debtor to incur sizeable administrative claims during the administration of the Chapter 11 case. In support of this position, the U.S.

Trustee cites *In re Blue Top Family Restaurant, Inc.*, 110 B.R. 777 (Bankr.W.D.Pa. 1990), in which the court dealt very harshly with counsel who was able to drag out a Chapter 11 case for a lengthy period of time while administrative expenses, primarily unpaid wage taxes, accrued. The court in that case commented that "the use of the bankruptcy system and a lawyer's talent to inflict further harm on innocent parties, is an abuse of the system". *Id.* at 778. There the court fixed the attorneys' fees at $1,500 and ordered disgorgement of $3,500 of a $5,000 pre-petition retainer paid to the attorneys. While I am not inclined to inflict a fee reduction on the attorneys in this case of a magnitude as ordered in *Blue Top,* the opinion of the court in that case is reflective of my own views with regard to this case. The extent to which the attorneys in this case allowed the administrative claims to reach their current level will be addressed in the discussion of the quality of services, the results obtained, and the benefit of the estate.

■ In evaluating the issues of quality of services rendered, results obtained, and benefit to the estate, it is appropriate to divide the services rendered into the following five (5) categories:

    (1) First Union litigation;

    (2) Sale of commercial building;

    (3) Tappouni litigation;

    (4) Dyal litigation; and

    (5) Chapter 11 administrative representation.

With respect to the First Union litigation and the sale of the building, the services rendered by Ruff & Cohen were of high quality, produced excellent results and were very beneficial to the estate. The settlement of the First Union claim and the sale of the building resulted in the release of pre-petition liens and encumbrances on virtually all of the estate's assets producing conditions under which the chances for a successful reorganization were maximized. The fee application reflects a total of 64.4 hours spent in conjunction with the First Union litigation and 45.42 hours in connection with the sale of the building. At an hourly rate of $150.00 per hour, the combined total of fees in connection with these two categories is $16,473.00, all of which will be awarded.

■ With respect to the Tappouni litigation, once again, the estate derived a significant benefit from the results obtained and the attorneys' services were of high quality. While the end result of that litigation was the allowance of a pre-petition unsecured claim in the amount of $122,000, that litigation centered around novel and complex issues regarding the assumption of executory contracts. Had the estate not prevailed in that litigation, the administrative claims to be dealt with now would have been doubled. The firm of Ruff & Cohen spent 51.4 hours in connection with the Tappouni litigation, totaling attorneys' fees of $7,710.00, all of which will be awarded.

■ With respect to the Dyal litigation, Ruff & Cohen expended 10.1 hours, which totals $1,515.00 in fees, all of which will be awarded. Ruff & Cohen's efforts in that litigation once again reserved the debtor's ability to remain in its business premises.

■ The final and most troubling category of services rendered by Ruff & Cohen is that of the administration of the Chapter 11 case itself. While Ruff & Cohen skillfully maneuvered the ship of this estate past the rocks of the various categories previously discussed, they failed to notice the iceberg looming in its path which would ultimately sink the ship. While the debtor was able to relieve itself of the burden of the pre-petition secured claim of First Union, nothing was done to correct the operational problems which led the debtor into reorganization in the first place. Until the final plan and disclosure statement were filed, in which the debtor proposed to sell two major items of equipment and outsource its fabrication process, there were no apparent operational changes during the entire reorganization process. The business operated the same as it had before the Chapter 11 case was initiated and with the same management. It was this management which continued to allow payroll taxes to go unpaid, resulting in over $60,000 in post-petition administrative payroll taxes. It was this management which was unable or unwilling until after the January 4, 1996 hearing to prepare and file monthly operating reports

on a timely basis. While the attorneys, in their lengthy response to the U.S. Trustee's objections, claimed that the revelation in January of 1996 that unpaid payroll taxes had risen to over $60,000 came as a complete shock to them, such would not have been the case had the monthly operating reports been filed when due and the attorneys reviewed those reports. The operating reports which were filed during 1995, albeit in an untimely fashion, reflected the accruing tax liabilities. This should have raised a red flag well before January of 1996.

While the debtor was in financial disarray during 1995, Ruff & Cohen continued to prepare and submit amended plans and disclosure statements and began accumulating the funds in their trust account which they hoped could be used to pay their fees at confirmation. They continued to resist all efforts to have the case either dismissed or converted, including the efforts at the January 4, 1996 hearing as previously described herein. How they were able to compile the financial data and projections contained in the various disclosure statements submitted without the benefit of current monthly operating reports is beyond me. Due to the efforts of Ruff & Cohen, this debtor was able to operate at a loss for over 2½ years in Chapter 11. While the attorneys should not necessarily be blamed for the lack of management and the lack of success of a Chapter 11 debtor, nor should they be rewarded for stringing a bad case out for a lengthy period of time. As my colleague Chief Judge Mannes aptly put it in *In re York Village Associates*, 29 B.C.D. 1283, 1287 (Bankr.D.Md.1996):

> W & G spent a great deal of time beating a dying horse. It urges that it did not know that the horse was near death when it invested further time and effort in the project. If attorneys are not guarantors of the results in bankruptcy cases, they may not remain ostrich like and ignore the reality of a case crumbling about them.

Based on the quality of work, results obtained, and benefit to the estate from the services rendered by Ruff & Cohen in relation to the general administration of this case, I find that an across the board reduction of fees in the category of Chapter 11 administration of 25% for all time spent up to and including January 4, 1996, is warranted. After January 4, 1996, it is clear that the efforts of Ruff & Cohen were directed at attempting to salvage the interests of the Wickers individually rather than benefitting the creditors of the estate. By convincing me not to convert this case on January 4th, all counsel did was to delay the inevitable. Accordingly, I find that all work done after January 4, 1996, in pursuing a reorganization, was of absolutely no benefit to the estate and is, therefore, noncompensable. The fee application reflects a total of 87.38 hours spent providing Chapter 11 services, of which 37.6 hours was spent after the January 4, 1996 hearing. Accordingly, the fees for 49.78 hours, representing the hours spent providing Chapter 11 services prior to January 4th, at $150 per hour are reduced by 25% and will be awarded in the amount of $5,600.25.

### Summary

Based on the foregoing, the firm of Ruff & Cohen shall be awarded attorneys' fees for representation of the debtor-in-possession in the amount of $31,298.25. Expenses shall be awarded in the amount of $1,034.00. Accordingly, it is hereby

ORDERED AND ADJUDGED that:

1) The law firm of Ruff & Cohen be and same is awarded attorneys' fees in the amount of $31,298.25 and reimbursable expenses in the amount of $1,034.00.

2) The sum of $5,000 received as a prepetition retainer shall be credited against the foregoing award for a total award due to Ruff & Cohen of $27,332.25.