**In re James L. GAY, Jr., Debtor.**

**No. 02–56825–RAG.**

United States Bankruptcy Court,
D. Maryland.

June 27, 2008.

Marc R. Kivitz, Baltimore, MD, for Debtor.

*MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART SECOND AMENDED FIRST APPLICATION FOR DEBTOR'S ATTORNEY'S COMPENSATION*

ROBERT A. GORDON, Bankruptcy Judge.

## I. *Preliminary Statement*

Before the Court is the Second Amended First Application for Debtor's Attorney's Compensation (Second Amended First Application) (Dkt. No. 286).[1] The questions raised by the Court *sua sponte* regarding the Second Amended First Application are: (1) whether the Court has any authority to regulate payments received by an attorney validly employed by the Debtor–in–Possession pursuant to a court order when said payments are allegedly received from a non-debtor entity and (2) what, if any, sanctions are appropriate when said professional fails entirely to disclose the receipt of payments from the non-debtor entity in violation of the relevant provisions of the Bankruptcy Code and Rules.

## II. *History and Background*

This case was commenced by the filing of a Voluntary Petition for Relief under Chapter 11 (Petition) by the Debtor, James L. Gay, on April 26, 2002 (Petition Date). At that time, a Statement Pursuant to Rule 2016(b) (Statement) (Dkt. No. 2) was also filed on Debtor's behalf. The Statement was signed by Debtor's counsel, Marc R. Kivitz, Esq. (Counsel or Applicant). The Debtor also signed the Statement, signifying his acceptance and agreement to the terms set forth therein. In short, the Statement summarizes and discloses the basic, material terms of the attorney-client relationship between the Debtor and Mr. Kivitz including Counsel's hourly rate, the amount initially paid to-

---

1. Since the filing of the Second Amended First Application, Debtor's attorney has also filed a Second Application for Compensation (Dkt. No. 292, October 9, 2007) and a Third Application for Compensation (Dkt. No. 327, March 17, 2008).

ward the retainer ($2,500)[2], and the services covered (and excluded) from the Parties' agreement. In pertinent part, the Statement provides, "debtor's future income, which is not an estate asset, shall be used to pay the balance of the initial retainer and any additional fees or expenses incurred, subject to the approval of the court." Statement at p. 1. On the second page, the Statement also indicates that "the source of monies paid by the debtors (sic) to the undersigned was wages and compensation received by the debtors (sic)." Thus the point is emphasized in the Statement that Mr. Kivitz was being paid for his legal services rendered on the Debtor's behalf from property that was expressly excluded from property of the estate under 11 U.S.C. § 541(a)(6).[3]

Also on April 26, 2002, Debtor filed an application to employ Mr. Kivitz in order to obtain approval of his representation of the Debtor as required by Section 327(a) and Fed. R. Bankr.P. 2014(a). The Order Authorizing Employment of Counsel Under General Retainer (Order Authoring Employment of Counsel) (Dkt. No. 12, November 13, 2002) provides in pertinent part that, "James L. Gay, debtor, be, and hereby is, authorized to employ Marc R. Kivitz as attorney and his staff of attorneys and paralegals under a general retainer as necessary for the administration of this case *all compensation subject to order of court*". The italicized portion is emphasized to indicate that it was specifically handwritten into the body of the Order by the Honorable James F. Schneider, who was then the presiding judge.[4]

Over the subsequent six-year course of this Chapter 11 case, the Statement was the *only* disclosure of compensation filed pursuant to Section 329 and Rule 2016(b); i.e., Counsel *never* took any steps as required by the pertinent Statute and Rule to update the representations included in the Statement. Nor did he seek prior court approval of any of the self-described "retainer" payments allegedly made by a non-debtor entity but which were initially projected to be derived from the Debtor's exempt income.[5] And therein lies the problem.

The Debtor's First Application for Debtor's Attorney's Compensation was filed on May 15, 2007 (First Application, Dkt. No. 271), more than five years after the commencement of this case. Both the Amended First Application (Dkt. No. 273), filed

---

**2.** The agreed upon retainer was $10,000.

**3.** Hereafter, all statutory references will be to the Bankruptcy Code, found at Title 11 of the U.S.Code, unless otherwise indicated.

Section 541(a)(6) includes as estate property various types of interests that may arise from estate property after the petition date with the notable insulation of "earnings from services performed by an individual debtor after the commencement of the case". Section 1115(a)(2), enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), changes the law in this regard for individual Chapter 11 debtors. This new section provides that "earnings from services performed by the debtor after the commencement of the case" are property of the estate in an individual Chapter 11. That section does

not apply to this case as the Petition was filed prior to October 17, 2005, BAPCPA's effective date.

**4.** The undersigned was sworn in as a Bankruptcy Judge for this District on June 19, 2006. Soon thereafter, numerous pending cases, including this one, were re-assigned to the undersigned.

**5.** With respect to the payments made by Circle J (see *infra*), the Applicant refers to them interchangeably as "retainers" and "payments". From the context it is difficult to determine whether Counsel is acknowledging that the payments have been made, credited and spent (in other words that the money became "his") or that the money is being held in escrow pending a ruling on the fee applications.

quickly thereafter on May 23, 2007, and the Second Amended First Application, filed on September 7, 2007, cover the same period of time as the First Application, that being the period of April 22, 2002 through May 15, 2007. Moreover, they each indicate in the summary statement on the first page that they request approval of, *inter alia,* "Retainers Received" of $42,510. Regarding these "retainer" payments, each successive application recites at paragraph 3 that:

> Counsel had received payment not from the debtor, but from Circle J Enterprises, LLC, a non-debtor entity, however, the Court's opinion that not only the debtor's interest in that entity but also his income from it were to be considered assets of this bankruptcy estate, the undersigned counsel seeks the Court's approval of the retention of payments and retainers received and the payment of the balances owed.

Furthermore, in discussing the subject payments at p. 15, paragraph g of the Second Amended First Application the Applicant writes:

> A payment was received on July 23, 2004, from a non-debtor third party, Circle J Enterprises, LLC ... and a second payment was received on January 11, 2005, from Circle J Enterprises, LLC ... but these payments did not satisfy the costs and expenses incurred for the services rendered to those dates by debtor's counsel.

Hence, it is acknowledged in the Second Amended First Application that years ago payments totaling over $40,000 from a non-debtor entity, Circle J Enterprises,

LLC (Circle J), had been made to the Applicant in exchange for services rendered "in connection with" the case. Rule 2016(b) explicitly requires that such payments shall be disclosed in a statement filed with the court no later than 15 days after the payment is made. Plainly, that did not happen here.

It appears that the payments are now disclosed in the successive fee applications in part because of what transpired earlier with respect to the Debtor's efforts to gain approval of his disclosure statement. For that reason, a slight digression is in order. Debtor filed his first disclosure statement on September 29, 2004 (Dkt. No. 90). That document was supplemented by a filing on January 10, 2005 (Dkt. No. 114) and approval was denied by Order entered on January 24, 2005 (Dkt. No. 118). Thereafter, three more iterations of disclosure statements were filed through March 31, 2006.[6] The Third Amended Disclosure Statement was approved by Order entered on April 5, 2006 (Dkt. No. 194). The matter moved towards confirmation in "fits and starts" with, among other things, a significant amount of pre-confirmation paper filed and two continuances granted. Finally, a hearing was held on August 28, 2006.[7] Because Counsel had to attend a funeral that day, the hearing was effectively aborted. However, the undersigned indicated on the record that based upon a fresh review of the Third Amended Disclosure Statement, its approval would be *sua sponte* reconsidered and on that basis, denied with leave to amend.

The reasons underlying the reconsideration are set forth in the Order Sua Sponte

---

**6.** See Amended Disclosure Statement (Dkt. No. 124, May 23, 2005), Second Amended Disclosure Statement (Dkt. No. 167, November 14, 2005), Order Denying Approval of Second Amended Disclosure Statement (Dkt. No. 190, February 17, 2006) and Third

Amended Disclosure Statement (Dkt. No. 192, March 31, 2006).

**7.** This was the first hearing presided over by the undersigned.

Reconsidering and Denying Approval of Third Amended Disclosure Statement with Leave to Amend (Sua Sponte Order) (Dkt. No. 237, November 13, 2006). And those reasons help to explain Counsel's untimely disclosure of the payments for which approval is now sought. Among other things, Debtor sought to explain in his Third Amended Disclosure Statement why his proposal to pay his general unsecured creditors only approximately 7% of their claims was fair and reasonable. Debtor asserted that the source of the money to be paid would be his "Net Revenue/Disposable Income". Debtor further claimed that because it was "income" and would otherwise be excluded from property of the estate by operation of Section 541(a)(6) as earnings for services performed, creditors would have had no right to any of the money if the case was converted to Chapter 7. Hence, his willingness to carve out and distribute a total of $5,000 to a class of claims totaling approximately $70,000 was posited as an act of good faith generosity.

However, a cursory review of the information included in the Third Amended Disclosure Statement regarding the Debtor's financial affairs seemed to dramatically undercut his position as to this aspect of his plan. That information suggested that contrary to his implied assertion, the Debtor was not a salaried wage earner employed by the entities identified in the Disclosure Statement such that Section 541(a)(6)'s safe harbor would apply to exempt his future income from property of the estate. Instead, it clearly appeared that instead Debtor had percentage ownership interests in each entity which in turn had interests in several ongoing real estate projects. Moreover, the Debtor's projections indicated that those entities were expected to turn a significant profit at various intervals over the foreseeable future and that the anticipated proceeds were to be the source of the $5,000 payment. As projected by the Debtor, the total anticipated profit would run into the multi-millions. Hence it appeared that the Debtor would be receiving a stream of cash dividends simply as a result of his equity in the companies and not for wage payments for ongoing, post-petition services rendered as an employee. As stated in the Sua Sponte Order:

> Most, if not all, of the anticipated net income appears to be derived from projects that are already in process. Additionally, it appears Debtor will derive this income primarily as a result of his passive ownership interest in each entity. Accordingly, the projected income appears to be more in the nature of dividends or profits rather than compensation for services rendered as an employee after the commencement of the case that would be excluded from the bankruptcy estate under Section 541(a)(6).[8]

The accuracy of the Third Amended Disclosure Statement was thus drawn into question along with the Debtor's good faith as it appeared he was attempting to get away with paying his unsecured creditors a mere pittance while he stood to gain millions of dollars in the years immediately subsequent to the plan's effective date.

The Sua Sponte Order was entered on November 13, 2006, a little over 60 days after the hearing. Debtor was given 60 days from the Order's entry to amend his disclosure statement. However, Debtor did not file an amended disclosure statement by the assigned deadline of January 12, 2007. Accordingly, the U.S. Trustee filed a Motion to Convert to Chapter 7 or Dismiss on January 15, 2007 (Dkt. No. 239). Even with that added motivation,

8. Circle J was included as one of these entities.

Debtor did not file his Fifth Amended Disclosure Statement until February 12, 2007 (Dkt. No. 252)[9]. The Fifth Amended Disclosure Statement did not contest any of the points made by the Court in the Sua Sponte Order or, more specifically, seek to establish that the Debtor's share of the proceeds in question would be exempt from property of the estate. Instead, the Fifth Amended Disclosure Statement made it clear that the Debtor's plan would pay all unsecured claims in full and that his entitlement to the money in question was based upon his equity interests in the identified companies.

The disclosure and confirmation process continued to meander for over another year. Counsel filed a Revised Fifth Amended Disclosure Statement (Dkt. No. 264) on March 22, 2007 which was disapproved on March 26, 2007, at which time Counsel was given 45 days to file a revised disclosure statement, i.e. until May 10, 2007. When the disclosure statement was not timely filed, the Court entered an Order to Show Cause (Dkt. No. 277) on July 20, 2007. At a hearing held on August 21, 2007, the Court dissolved the Order to Show Cause with the understanding that the revised disclosure statement would be filed within 15 days. On September 7, 2007, Counsel filed a Sixth Amended Disclosure Statement (Dkt. No. 287). The Sixth Amended Disclosure Statement was eventually approved, with slight modifications, on January 4, 2008 (Dkt. No. 313) with confirmation of the Modified Sixth Amended Plan following on March 13, 2008 (Dkt. No. 324).

However, that process had become shadowed by the several iterations of fee applications filed by Mr. Kivitz. As noted *supra*, the First Application was filed on May 15, 2007 (Dkt. No. 271). Soon thereafter it was modified and the total compensation requested reduced by about $5,000 in an Amended First Application filed on May 23, 2007 (Dkt. No. 273). Both versions revealed for the first time the Applicant's prior receipt of payments from the non-debtor entity, Circle J, as described above. A hearing on the Amended First Application was held on August 21, 2007, in conjunction with the Order to Show Cause for the failure to file an amended disclosure statement. At that time, the propriety of the payments from Circle J was *sua sponte* raised and questioned by the Court. An Order Denying Amended First Application was entered on August 24, 2007 (Dkt. No. 282). Counsel was directed to file another amended application for compensation and include an accounting of all payments made, any related documents, and a legal and factual justification for the payments in addition to making an allowance for an exercise of billing judgment. The Second Amended First Application currently pending before the Court represents Counsel's response to the Court's instructions.

## III. *Analysis*

Several sections of the Bankruptcy Code deal with the payment of compensation to professionals and others who serve the bankruptcy estate.[10] Generally speak-

---

**9.** The record reflects that there is no filing entitled Fourth Amended Disclosure Statement.

**10.** The following is a brief summary of the sections governing the employment of, and compensation for, professionals.

Section 327 provides that a trustee may employ attorneys, accountants, appraisers, auctioneers or other professionals as officers and representatives of the estate. A request for approval of employment must be made by application to be reviewed under Fed. R. Bankr.P. 2014. In Chapter 11 cases, Section 1107 clothes the debtor-in-possession with the rights of a trustee under Section 327. Thus a

ing, affording administrative priority to the payment of reasonable and fair compensation due professionals who invest their skill and wisdom in the bankruptcy process is a crucial element of the system. Learned experts have repeatedly observed that the system could not function without the expectation that bankruptcy professionals will be paid a reasonable fee, as a priority over other claimants, for the work they do. Without that expectation, the system would collapse. Thus, the principle of affording significant deference to such fees is recognized and applied in the Code.

This general principle, however, must be balanced against the equally important truism that the bankruptcy estate is above all else a monument of trust. This means that the proper management of the estate carries with it paramount fiduciary obligations for the benefit of the debtor, creditors and other parties-in-interest. The bankruptcy court must ensure that attorneys that represent debtors do so in the best interest of the bankruptcy estate, do not have interests adverse to those of the estate, and only charge reasonable fees for services that are of benefit

to the estate. *In re Park–Helena Corp.*, 63 F.3d 877, 880 (9th Cir.1995).

In a practical sense, these obligations translate into a melange of standards and requirements enacted to rid the system of the shadows and fog that might obscure the clarity required to effectively administer justice. Respect for, and application of, the canons that govern this fundamental aspect of the bankruptcy system provide a context for virtually everything that goes on in a case. And the review of professional disclosures and fee applications is one area in particular where the principles that govern the conduct of a fiduciary properly come to the fore.[11]

On its face, this case raises an interesting tension between the two sets of principles described above. The Debtor's confirmed plan indicates that all creditors will be paid in full either by agreement, without objection, or by the terms that the Debtor somewhat reluctantly included in the plan. Hence, an argument can be made that since there is no presently identifiable injury to creditors no remedial action should be taken. Likewise, neither any creditors, nor the U.S. Trustee, have objected to any of the iterations of the

debtor-in-possession may retain bankruptcy counsel with court approval.

Under Section 328, compensation for the employment of professionals may be on any reasonable terms, including on a retainer, hourly basis, or contingency fee basis, and should be spelled out in the application to employ. Section 330 authorizes the Court to award to professionals reasonable compensation and reimbursement of necessary expenses, after the consideration of a number of statutorily enumerated factors. Professionals may also apply for an award of interim compensation under Section 331. A request for compensation must be made by application in conformity with Fed. R. Bankr.P. 2016(a) and this Court's Local Rules governing fee applications. See Appendix D to the Local Bankruptcy Rules of the U.S. Bankruptcy Court for the District of Maryland.

Additionally, Section 329 requires an attorney for the debtor to file a disclosure of compensation paid or agreed to be paid in connection with the case and the source of such payment, regardless of whether the attorney intends to seek compensation from the estate. The disclosure is to be made in accordance with Fed. R. Bank. P. 2016(b).

11. As a trustee, a debtor-in-possession is bound by all the fiduciary obligations inherent in that role. Judge, later Justice, Cardozo once wrote, "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928).

First Application. This lack of interest, notwithstanding the *prima facie* violation of the relevant disclosure requirements, certainly tends to limit the Court's ability to make a searching inquiry. It also deprives the Court of a well-sharpened adversarial debate, albeit for what may be sound, practical reasons. The extent to which the integrity of the system should yield to pragmatic considerations, or vice-a-versa, is thus brought to the forefront of this dispute.

■ Section 329(a) lays down an inflexible rule of disclosure with respect to payments made to attorneys representing debtors for services rendered, or to be rendered, in connection with the case. Counsel must disclose the agreed amount of compensation for services rendered in connection with the case as well as the source of such compensation, regardless of whether counsel will seek compensation from the estate. Rule 2016(b) provides the procedural mechanism for the enforcement of the statute. Debtor's counsel must make the disclosures required by Section 329(a) by filing a statement in writing, and serving the same upon the U.S. Trustee, either within 15 days of the order for relief or, if later, within 15 days of the date of any payment or agreement not previously disclosed. While the Statute and Rule do not provide an express penalty for a failure to comply, they impose upon attorneys an independent responsibility to make the requisite disclosures. *Park–Helena Corp.*, 63 F.3d at 880. Failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have demonstrated that the attorney did not violate any other provision of the Bankruptcy Code or Rules. *Id.* Section 329(b) additionally authorizes the Court to order the refund of any amount over and above the reasonable value of the services rendered, regardless of whether the compensation was paid by the estate or a non-debtor entity. In order for this provision to have full effect, commiserate with its obvious intent, it is imperative that counsel fully disclose the compensation arrangement as required by Section 329(a).

■ There can be but no doubt that Counsel did not disclose the actual arrangement for the payment of compensation until he filed the succession of First Applications for Compensation. The Statement filed at the inception of this case makes no mention of the payment of compensation by non-debtor entities. Counsel never updated the Statement and thus kept the truth of the arrangement hidden from the Court and parties-in-interest *for a period of approximately three years after the payments were made.* There was no chance for meaningful review or scrutiny of the proposed compensation arrangement and the Court and other parties-in-interest "should not be required to ferret out facts" which the Rules required Counsel "to openly and timely disclose". *In re TJN, Inc.*, 194 B.R. 400, 402–403 (Bankr.D.S.C.1996) (holding that a supplemental Rule 2016(b) disclosure is required if there has been a change in the compensation agreement because it serves to provide all parties and the court an opportunity to scrutinize the appropriateness of the payment arrangements and the duty to provide the same is not vitiated by the inclusion of the disclosure of a payment in a subsequent fee application). And when the Rules are not adhered to in this sensitive area this Court is of the opinion that sanctions are appropriate in the absence of substantial mitigating factors. Therefore, the Court finds that Counsel is in violation of Section 329(a) and Rule 2016(b) and because there are no mitigating factors apparent from the record, Counsel must be sanctioned.

In the Second Amended First Application, Counsel attempts to explain why he did not previously disclose the fee payments by Circle J and why the exercise of billing judgment is not appropriate in this instance. In short, the Court finds no merit in Counsel's claims.

Starting at p. 16 of the Second Amended First Application under the heading "Billing Judgment", the Applicant has attempted to rebut the Court's *sua sponte* concerns. Applicant's contentions are:

1. That Counsel rendered substantial services to the estate over a lengthy period of time without compensation;

2. That compensation will be paid from the Debtor's postpetition income and such income is not property of the estate;

3. That Court approval of the payments is not required because the money was paid from a non-estate third party source;

4. That the depreciating value of money over time counsels against any present reduction in fees; and,

5. That the 'billing judgment' consideration should not be treated as mandatory and, if it is, a minimal write off of $1,000 is adequate.

■ With respect to the first contention, it is not at all unusual for payment to be deferred for long periods in bankruptcy matters. However, contrary to the Applicant's assertion, that is not what happened here. The Applicant was paid approximately half of the total compensation for which approval is now sought in two payments, occurring in July 2004 and January 2005 [12]. That was over 3 years ago and approximately two and a half years after the Petition Date. As reflected in the Applicant's time sheets attached to the Second Amended First Application, the total amount claimed, now over $85,000, had certainly not accrued then.[13] Hence, as a result of the payments from Circle J, the Applicant was *at least* paid (or secured, as the case may be) for any compensation that accrued between April 2002 and January 2005.

Moreover, it does not appear to have been particularly troublesome for the Applicant to obtain the payments. No detail is provided with respect to how the payments came into the Applicant's possession nor is any written agreement supplied. It simply appears that either the Debtor decided on his own that the time had come to make payment or Counsel demanded the same. Viewed in that light, it does not appear that the passage of time adversely affected the Applicant's risk in any way or that he was at any greater risk of nonpayment than debtor's counsel in the average Chapter 11. The Court must also question why, if Counsel feared that there was a real possibility that he would not be paid in this case, he waited five years to file an application for compensation.[14]

---

**12.** See check dated July 21, 2004 in the amount of $20,000 from Circle J Enterprises LLC and undated check in the amount of $20,000 from Circle J Enterprises LLC. Counsel asserts that the second check was tendered on January 11, 2005. Second Amended First Application, Exhs. B & C.

**13.** Indeed, according to Counsel's time sheets, it appears that Counsel had billed for services totaling approximately $35,000 by January 11, 2005, much less than the $42,500

received by Counsel at that point in time (in addition to the $40,000 from Circle J, Counsel received $2,500 from the Debtor on April 24, 2002). This alone raises the ugly notion that by this undisclosed arrangement, Counsel may have allowed himself to be paid more than he was due.

**14.** While the First Application spans a period of five years, the Second and Third Applications cover much shorter intervals of four and six months respectively.

This delay certainly cuts against Counsel's assertion that he was at great risk of nonpayment of his fees. Indeed, it appears to the contrary that the delay is more reflective of the fact that Counsel was being paid in secret, outside of the watchful eye of the Court and parties-in-interest.

▇▇ As for the second and third points, the factual narrative provided above with respect to the progression of Debtor's disclosure statements undercuts completely the Applicant's assertions. While the Applicant claims that the money paid was exempt by operation of Section 541(a)(6) and therefore was insulated from scrutiny, and relies upon certain reported cases to support that position (see e.g. *In re McDonald Bros. Constr., Inc.,* 114 B.R. 989 (Bankr.N.D.Ill.1990)), the representations included in the Sixth Amended Disclosure Statement lead to a different conclusion. At p. 11, Debtor begins an explanation of his personal property interests. These encompass interests held in various commercial enterprises, including Circle J. Summarizing his interests, and their impact on the plan, the Sixth Amended Disclosure Statement stated, "The personal property non-exempt equity of $53,050.00 in combination with the equity in Mr. Gay's real properties and the increase in the value of his membership interests in these corporate entities compels the payment in full of all general unsecured claims". Sixth Amended Disclosure Statement at p. 13. While the Debtor did persist in sprinkling the phrase, "Net Revenue/ Disposable Income" in several places throughout the Sixth Amended Disclosure Statement to describe the expected realization from non-debtor entities, he did not attempt to seriously characterize his personal cash flow as "salary or wages" or make the argument that it should be excluded from property of the estate. The approved Sixth Amended Disclosure Statement is the final word on this and hence, the Applicant cannot make that argument now.

▇▇ In light of the representations included in the approved disclosure statement and the Debtor's ability to exercise complete dominion and control over the subject proceeds, there can be no question but that Debtor's profits generated from Circle J are property of the estate, not excluded by operation of Section 541(a)(6) but to the contrary, expressly included by the terms of that section. Accordingly, that money should not have been paid to the Applicant without court approval.[15] Indeed, the Order Authorizing Employment of Counsel signed by Judge Schneider at the inception of the case dictates that result regardless of the source of the money. Moreover, whether approval should have been sought or not, it is clear that the Applicant violated Section 329(a) by not disclosing the payments in the manner required by Rule 2016(b).

With respect to the Applicant's "time value of money" theory, that contention is adequately rebuffed by the comments set forth above with respect to point one.

▇▇ Finally, the Applicant contends that an exercise of billing judgment is not mandatory and would be otherwise inappropriate under the circumstances, except to the extent of $1,000. With respect to whether a write-off is mandatory, the Applicant relies upon *In re Vu,* 366 B.R. 511, 520 (D.Md.2007). In *Vu,* the District Court does appear to take a somewhat less

---

15. It bears repeating here that the Applicant has characterized the previously undisclosed transfers as both "retainers" and "payments", without an exact explanation of their present status. However, in light of the ultimate result, the Court does not believe that a final answer to the question raised is necessary.

rigid view of the billing judgment question than did this Court in *In re Maxine's, Inc.*, 304 B.R. 245, 249 (Bankr.D.Md.2003) and *In re Bernard Hill, Inc.*, 133 B.R. 61, 62 (Bankr.D.Md.1991). The Court stated, "the exercise of sound billing judgment requires the voluntary reduction of fees only when those fees would otherwise reflect services of marginal value or benefit." *In re Vu*, 366 B.R. at 520.[16] Thus counsel must, at a minimum, review the work performed and the resulting fees to determine whether they were of marginal value or benefit. Nevertheless, the Court is the ultimate arbiter of the value of the services performed and in the *Vu* case Judge Chasanow essentially decided to defer to the Bankruptcy Court's final judgment with respect to the overall value of the fees sought after conducting a searching inquiry of the decision itself. Applying that logic to the Second Amended First Application, the conclusion is inescapable that a portion of the fees should have been written off as a function of billing judgment.

For example, much of the early stages of this case was consumed with the Debtor's attempt to assume a restructure agreement between it and the dominant lienholder-creditor, Coyote Portfolio, LLC. The Applicant acknowledges charging legal fees of approximately $8,000 for that work. However, a fair reading of Judge Derby's opinion on the Debtor's motion to assume demonstrates that when the matter was brought to hearing, there was little, if any, merit to the Debtor's claim that the agreement could be assumed (Dkt. No. 77). While there may have been some hidden benefit to the estate as a result of the work performed in that effort, it is not apparent from the record.

Likewise, the Applicant seeks fees of approximately $7,500 for services rendered in defending motions to dismiss on the Debtor's behalf. If a good faith defense to a motion to dismiss can be mounted on a debtor's behalf then it should be. However, the record amply demonstrates that more than once, motions to dismiss were filed simply because of the Debtor's dilatory conduct and failure to comply with either court orders or administrative requirements. While that is not entirely the Applicant's fault, the Applicant should bear some responsibility for failures to attend to fundamental bankruptcy obligations with which experienced counsel should be well familiar. At a minimum, Counsel should be cognizant of upcoming deadlines and should take advance action to mitigate any approaching quandary, rather than simply ignore the deadlines' expiration and wait for a motion to dismiss to be filed. If a motion is filed under such circumstances then it is difficult to see any appreciable "benefit to the estate and creditors" when a response is prepared to delay the process and allow the debtor to do what it should have done months before.

The vast bulk of the attorney's fees sought by Counsel were incurred as a result of the preparation of plans and disclosure statements. Total fees sought for services rendered in these two categories equals approximately $39,000. Much of what is said above with respect to the Court's reconsideration of the approval of the Third Amended Disclosure Statement applies to this portion of the analysis. The Debtor's Third Amended Disclosure Statement simply did not provide an accurate portrayal of his financial affairs. The inaccuracies fell into two major categories: the

16. The undersigned practiced law for 23 years before coming on the bench. From that perspective, it is difficult to imagine a case where, in hindsight, none of the work billed has marginal, or less, value and every penny charged is completely justified.

Debtor's mischaracterization of (a) the status of his relationship with the IRS and the effect thereof on the liquidation analysis and (b) the nature of the income he anticipated receiving from entities in which he has significant ownership interests. In each instance, the inaccuracies were used by the Debtor to justify lesser distributions to creditors under the plan. Among other things, this meant that the Third Amended Disclosure Statement required significant revisions in order to meet the relevant standard. This necessity grew out of the Debtor's efforts to cover his true financial picture with what amounted to legal graffiti. And in the Second Amended First Application, the Applicant takes responsibility for being the one who wielded the spray can.

The contrast between the Third Amended Disclosure Statement and the final, approved Sixth Amended Disclosure Statement is striking. In short, Counsel should not be rewarded for a failed attempt to distort the Debtor's financial affairs and the remedial work that went into bringing the disclosure statement in line with the truth. Thus, for all the reasons identified, the Court concludes that a greater exercise of billing judgment is warranted in this case.

As indicated above, Counsel asserts in the Second Amended First Application that because the previously undisclosed payments were made by an entity other than the Debtor the funds remitted for Counsel's fees were not property of the estate, there was no need to apply for approval of their payment, and the Court may not scrutinize them. For the reasons set forth above and as admitted in the

Debtor's approved Sixth Amended Disclosure Statement, that argument does not hold water. Even if Counsel's argument was in fact correct and Counsel did not need approval for the payment of compensation, this did not absolve Counsel of the duty of disclosing the source of payment under Section 329(a) and Rule 2016(b).

■ As noted *supra*, debtor's counsel must disclose the precise nature of the fee arrangement by laying bare all of his dealings regarding compensation with all parties. *Park–Helena Corp.*, 63 F.3d at 881. If that had happened in a timely fashion in this case, parties-in-interest would have been on notice of Debtor's position that income derived from his interest in his business entities was not property of the estate and that Counsel was being paid from that source. The fact that this disclosure did not occur leads inevitably to grave doubt and concern with respect to Counsel's loyalties and intentions and, moreover, the integrity of the case. A fiduciary, or its agent, must *not* find himself in this position.

■ Severe sanctions may properly be imposed for violations of the disclosure requirements of Section 329(a) and a failure to follow Rule 2016(b), whatever the source of the payments may be. In *Park–Helena Corp.*, the Court of Appeals for the Ninth Circuit affirmed the decision of the bankruptcy court denying all fees and costs when counsel for the debtor included a misleading statement about the source of compensation in its application to employ and only corrected the misimpression after a creditor objected to its fee application.[17]

---

17. Counsel for the debtor received a $150,000 retainer in the form of a check drawn on a personal account of the debtor's president, but in its application to employ, claimed that the payment came directly from the debtor. Counsel made the identical representation in

its fee application. A creditor objected, alleging that counsel violated Section 329(a) and Rules 2014 and 2016 by failing to disclose that debtor's president paid the retainer out of his personal account. The Court dismissed counsel's justification that, in effect, payment

The Court stated, "The disclosure rules are applied literally, even if the results are sometimes harsh. Negligent or inadvertent omissions do not vitiate the failure to disclose. Similarly, a disclosure violation may result in sanctions 'regardless of actual harm to the estate'" (internal citations omitted). *Id.* See also, *In re TJN, Inc.*, 194 B.R. at 403–404 (reducing counsel's fee by $3,500 when counsel failed to file a supplemental statement disclosing a second payment in the amount of $15,000 from debtor's principal while warning that the usual remedy is disallowance of all fees, to place the bankruptcy bar on notice that strict compliance with the disclosure requirements is expected); *In re Quality Respiratory Care, Inc.*, 157 B.R. 180, 181 (Bankr.D.Me.1993) (denying all compensation to counsel when counsel first disclosed payments from the debtor totaling $11,390.35 by filing a fee application 16 months into the case and holding that disgorgement is proper even if the failure to file the 2016(b) statement is the result of neglect, inadvertence, or mistake); *In re Brandenburger*, 145 B.R. 624, 627–628 (Bankr.D.S.D.1992) (holding that Section 329(a) applies broadly and citing to the

legislative history to note the concern of Congress that "payments to a debtor's attorney provide serious potential for evasion of creditor protection provision (sic) of the bankruptcy laws, and serious potential for overreaching by debtor's attorney, and should be subject to careful scrutiny").[18] Finally, it is plain that at least some of the fees sought reflect "marginal value or benefit" to the estate and creditors. The sum and substance of this is that there are several good reasons for sanctioning Counsel and ample legal authority for taking appropriate remedial action.

## IV. *Conclusions*

 The Court acknowledges that Counsel is recognized as being highly competent and skilled in the area of bankruptcy. Moreover, Counsel did perform valuable services to the estate in providing the legal guidance to the Debtor that permitted him to emerge from a difficult Chapter 11 proceeding while still retaining a fair share of his assets and paying his creditors all they are due. Among other things, Counsel should be particularly commended for engineering the reduction of the tax

by debtor's president was tantamount to payment by the debtor, since debtor's president had previously borrowed money from the debtor and the retainer payment would be credited toward his debt. The Court held that counsel's failure to describe the precise nature of the transaction constituted a violation of the disclosure requirements.

**18.** There is also a line of authority supporting a less draconian result. See *In re Anderson*, 253 B.R. 14, 20–22 (Bankr.E.D.Mich.2000) (holding that while counsel did file confusing and ambiguous Rule 2016(b) disclosures, he did not exhibit a *willful* disregard of his fiduciary obligations to fully disclose the nature and circumstances of his fee arrangement as to warrant denial of fees under Section 329 and Rule 2016, but finding that in conjunction with other problems exhibited by counsel denial of fees was appropriate), citing to *In re Downs*, 103 F.3d 472, 479 (6th Cir.1996); *In*

*re Cent. Fla. Metal Fabrication, Inc.*, 207 B.R. 742, 749 (Bankr.N.D.Fla.1997) (holding that while counsel for the debtor-in-possession has an affirmative duty to disclose all of its fee arrangements with the debtor-in-possession, a court may exercise its discretion to deny or reduce fees for counsel's failure to disclose fee arrangements; counsel's failure to disclose arrangements made two years into case providing that debtor was to deposit $24,802.15 into counsel's trust account and debtor's principals were to deliver proceeds of sale of real estate into the same in exchange for counsel's promise not to withdraw from the case did not warrant denial of fees when neither the estate nor its creditors suffered any harm as a result of the agreements, as all sums deposited were turned over to the trustee after conversion to Chapter 7 and the sale of the real estate did not occur).

claims against the Debtor and fending off the efforts of Coyote Portfolio, LLC to liquidate the Debtor's assets. However, the quantum of Counsel's skill, ability and experience are what make the crucial failure here all the more disheartening.

There is really no excuse for a failure to disclose over $40,000 in payments as required by Section 329(a) and Rule 2016(b). Moreover, it is evident that not all of the attorney's fees sought are for reasonable and necessary services that benefitted the estate. In view of the entire circumstances, with a specific focus on the fact that all creditors are to be paid in full under the confirmed plan and therefore it does not appear that there has been actual harm to the estate,[19] the Court is of the opinion that it would not be equitable to require disgorgement of all the attorney's fees from Counsel for the failure to properly disclose. However, the total fee should be reduced by a sum that roughly reflects the importance of the principles that were trampled upon. Thereafter, let this opinion serve as notice for the future.

Accordingly, it is by the United States Bankruptcy Court for the District of Maryland,

ORDERED, that the Second Amended First Application for Debtor's Attorney's Compensation is **approved in part and denied in part,** and it is further,

ORDERED, that the total attorney's fees sought by Debtor's Counsel shall be reduced by $10,000, and it is further,

ORDERED, that the total compensation awarded Debtor's Counsel on the basis of the Second Amended First Application for Debtor's Attorney's Compensation shall be $75,992.50 in attorney's fees and $2,458.38

in costs with said sums to be paid as an allowed administrative expense.

**SO ORDERED.**

---

**19.** The Court relies heavily on this fact in not requiring a more substantial or full disgorgement of fees. *See In re Cent. Fla. Metal Fabrication Inc.,* 207 B.R. at 749. In the event that this case is subsequently converted to Chapter 7, the Court may be forced to revisit its determination.